Q. May it please the Court, our orchestra appealed today the focus upon the distinction between a surety bringing a case based upon rights it received from a contractor who possesses a contract with the United States, is in privity of contract with the United States, in contrast with a surety bringing a case based upon rights that it has gained solely from a contract between it and the contractor. And that's the distinction here that is really quite important because of course the only set of rights that is accompanied by a waiver of sovereign immunity would be the rights that are possessed by the contractor in privity with the United States. Whereas the contractor, the contract that the surety here relies upon is in fact its bond contract, the contract between it and the contractor. There is no privity with the United States, that's very clear in Ransom, that's very clear in Fireman's Funds, the decisions of this Court that have clearly stated, especially in Fireman's Fund where it says equitable segregation and the ability to sue on a takeover agreement does not establish privity for pre-takeover events. Here what is outstanding in this, the claim that is outstanding is solely the discharge claim asserted by Lumbermans against the United States based upon its contract with the contractor, not the rights assigned to it from the contractor. Well what about national surety and the equitable segregation doctrine? I understand that equitable segregation, perhaps some ambiguity as to the extent to which equitable subrogation is before us in light of the order of the trial court dismissing that theory of claim, but just A, how about national surety and the equitable subrogation as a theory for bringing a pre-takeover claim? Indeed, Your Honor, and actually I must apologize to the Court because I believe we in our briefs because we do tend to talk about national surety in an equitable subrogation sense and I apologize because I'm afraid that we're contributing to the confusion that's promoted by Lumbermans and was propounded by Lumbermans and confounded by the trial court because national surety is very... Is your contention that national security is not an equitable subrogation case? Well essentially it's not, Your Honor, actually even though we assert that it is, it's a creature of equitable subrogation and indeed in national surety the Court states that the surety is equitably subrogated to the retainage funds in that case. However, that case arises from the takeover agreement and indeed the surety in national surety is a CDA contractor and reaches the Court by its CDA claims. Indeed, at the trial court it was first dismissed at the trial court because its claims had not been properly perfected pursuant to the prerequisites of the CDA. It had returned to that. I'm a little confused. Can I just back you up for a moment? Suppose this were not a case in which the surety were attempting to recover from the government but instead it was a case in which the surety refused to pay on the bond. Would the government agree that under those circumstances there is a pro-Tanto discharge doctrine and that if in fact the government had impaired the security that that could serve as a defense to an action on the bond? Well, Your Honor, and I'm sorry I may not be getting it all, but if the focus of the question is whether the surety may maintain entirely independent of the contractor's and the establishment and privity of the government, the pro-Tanto discharge claim. As a defense to a suit by the government against the surety? I see. I'm sorry, Your Honor. Well, I believe that at that point from a defendant's standpoint would the surety be able to assert pro-Tanto discharge against the government's claim. Presumably, yes. I'm not sure that we would necessarily argue that, but because in that situation indeed the surety would be placed in position of asserting specifically its rights and its rights are between it and based upon the bond. So you agree that it has a defense if the government is suing. What you're saying is that it doesn't have an independent action to recover what is essentially an overpayment on the bond. Indeed, Your Honor. And this case, the reason this appeal was so necessary out of this trial court's dismissal of the equitable subrogation claim by the surety. Thus, the surety approached the court with the two premises that it could come and maintain its case before the trial court. First, equitable subrogation. If national surety is not an equitable subrogation case, and I understand your argument as to why it is not, what is it then? Is it based on surety ship law? Well, actually, Your Honor, in a lot of ways it's just a CDA case, literally. At that point, the surety- I don't understand that. What's the substantive basis for the claim that's being asserted in national security and in this case? If it's not equitable subrogation, in other words, if the surety is not stepping into the shoes of the contractor, what is the basis for the claim? I mean, the treatises, the cases in the state law context are very unclear as to what the basis for an affirmative pro tanto discharge claim is. What is your contention as to what such a claim is based on if it is not based on equitable subrogation? I'm not talking now about whether there's a waiver of sovereign immunity. I'm just asking you, what's the substantive basis for the claim? The takeover contract. The takeover contract? Indeed, Your Honor. In fact, in national surety- That doesn't make any sense to me. I don't understand that. Well, indeed, in the state law context, there are no takeover agreements necessarily, and yet the courts have recognized that it's an affirmative claim to recover what are essentially overpayments. That's not based on any takeover agreement. Well, indeed. In those cases, it's not. Just like the Fifth Circuit's case cited by Luppermans, which rested upon the Mississippi law. Instead here, and in national surety specifically, the takeover agreement, and the court cites to that, that the takeover agreement specifically said that the surety was entitled to the funds available and including the retainage. That is also true here in this case. In the takeover agreement that Luppermans cited- I just don't understand how it could be based on the takeover agreement. That makes no sense to me. Well, it's an entirely separate contract, Your Honor. I understand that, but the theory pro tanto discharge is the idea that there's been an impairment of the security, and that as a result, the surety has been damaged, and that they have the right to recover. It has nothing to do with the execution of a takeover agreement. Indeed, Your Honor. I see our disconnect. When I'm asserting that the premise for their suit is indeed the takeover agreement, it's not reaching your question, which is, well, what then would be the premise for the pro tanto discharge claim in that case, much less in this case? My assertion is, at that point, that this is a distinction between the pre-takeover claims and the post-takeover claims. If retention is viewed as a pre-takeover claim, then it would necessarily have to come from a equitable separation premise, and in national surety, excuse me, I'm sorry. In national surety, that is how it's addressed. The court specifically says that the surety in that case was equitably segregated to the retained amount, and so at that point, it's identifying that pro tanto discharge in that scenario is, in fact, a creature of equitable subrogation. But the maintenance of that cause of action in the federal court necessarily has to be tied to a set of rights through which privity is established and through which the waiver of sovereign immunity is established. And so while that doesn't follow necessarily the state law, the state cases that have established the principle pro tanto discharge under surety principles, this court has embraced the pro tanto discharge or has recognized that as a principle through which the surety should be able to recover. But there is not an independent cause of action if the pro tanto discharge is resting by itself or resting alone. If it's a naked claim of pro tanto discharge without being connected to privity of contract with the United States, then it is lacking in the waiver of sovereign immunity and it cannot be from the state law concept of pro tanto discharge. That must necessarily be so, because as the Supreme Court pointed out and the court confirmed in Insurance Company of the West, that the claim necessarily needs to have a grounding and a waiver of sovereign immunity. I'm not sure that I get to your question, Your Honor. Let's assume that we view national surety as creating a right in the surety to proceed on equitable subrogation theory in order to get relief for the release, the improper release of retainage. Just accept that as a view that we could take of national surety. If we take that view, is there a basis on which you could distinguish this case since this case involves payment of progress payments? Or do you think that that distinction is meaningless? Indeed, Your Honor. Yes, we believe that distinction is significant. Most importantly- How would you? Yeah, well, go ahead. How would you tease out the- Well, specifically, the distinction between the provisions is important and necessary in that the retainage has been viewed repeatedly in authority that says the retainage is specifically in the mandatory. That was one of the distinctions we were trying to draw in our briefs is that the clauses here, the progress payments and especially the other clauses, the network analysis for the schedule and things of this, are inherently- have an inherent discretionary feature to them. Because it is the very specific means and tools for the contracting officer to administer the progress of the contract. Well, but as Judge Hodges pointed out, they may have some kind of inherent discretionary features, but they have very mandatory language, particularly certain ones of them. And point me to authority that tells us that that mandatory language is actually an expression of discretionary- It sounds mandatory, but it's discretionary. Yes, yeah. Do you have any support for that proposition? Well, other than the cases we've cited that have effectively recognized the need to have flexibility in administering the contract- Those are general. That's a general proposition, to be sure, but- No, I do not, Your Honor. I do not, no, in point, to your point, no, I do not have authority where any case, any court has embraced, well, the mandatory language of the progress payments clause that can be read to mean other than the contracting officer is responsible to do that. However- What strikes me is that there's a discretion as to whether to make the progress payments or not to make the progress payments, but that you cannot make the progress payments until there's proper certification. So the requirement of certification is a mandatory rather than a discretionary requirement, no? Yes, indeed, Your Honor. That's an important distinction. However, in this case, in some ways, I would suggest that if we back off from the specific terms of the specifics of those terms, or even the facts of the contracting officer explaining in his testimony very clearly that these were the tools that he used, that he reasonably relied upon the technical experts that he's supposed to rely on, and more importantly, that nobody ever in the government had any reason to suspect that there was anything wrong here. But there were. It is true, is it not, that there were several of the progress payments that were made without the requisite certifications? Well, they were made without the precisely correct certification. That's correct, Your Honor. However, the importance there is that the contracting officer was actually, perhaps overstating his being a little loose in his application of those terms. But notwithstanding that, the reason that was transpiring was because the contracting officer, no one in the government had any reason to suspect that there was anything wrong. Now, indeed, that doesn't forgive, if you will, the overpayment that Judge Hodges found. However, in contrast, at that same time, and it's very important that the contracting officer specifically testified, which I believe is at 324 of the appendix, that notice is what triggered their attention. And what happened in this case is that the surety actually had notice far in advance of the government. In fact, the surety was discussing the failure of payments by the contractor and questionable abilities of the contractor back from October to December of the preceding year. That's more than six months before the United States had any clue that anything was wrong. And the surety, instead of responding to that by taking any of the steps that it had in its bond, and it had many tools in the bond, or turning to the government and alerting the government to the possible failure of Landmark, instead it sat on its rights and now turns to the government and says, well, it's your fault, you spent the money, and we should be retaining it, or we should be recovering the retainage. And in fact, when we're working on equitable principles here, this picture, this contract actually is the picture of inequity. It's the exact opposite of these principles, that the surety was able to know about this potential default, not inform the government, and then be able to recover from the government when in fact the fraud was prosecuted or committed against the government. Why don't we stop there, and we will restore a couple of minutes. I apologize. I couldn't see the lights. I'm sorry. That's quite all right. Thank you. We'll hear from Mr. Jackson. May it please the court. Help me to understand what the theory of recovery in national security, national surety is. Put aside the issue of sovereign immunity, I have a couple of questions I'll ask you about that later, but let's just talk about the substantive cause of action. Strikes me very difficult to see it as equitable subrogation, that is the surety stepping into the shoes of the contractor, because the contractor was paid before there was any notice to the government, as Balboa and those other cases would require. So it strikes me that national surety must rest on some other substantive theory other than equitable subrogation. Am I wrong about that? No, Your Honor. I agree with you. It is a question of the application of suretyship principles and a pro tanto discharge theory of recovery or theory of defense used in that context. Right. So the question then is, since national surety didn't discuss the waiver of sovereign immunity question, whether Blue Fox, in effect, should be viewed as overruling national surety, because Blue Fox, as we've interpreted it anyway, says that you can have an equitable subrogation claim, but the other kinds of claims by subcontractors or other people, which might exist under state law, aren't within the waiver of sovereign immunity, which only extends to a contract or, of course, federal statute. Your Honor, I'd go back to Insurance Company of the West. In that case, this court was faced with a very specific issue as to whether the Tucker Act waiver of sovereign immunity for suits based on a contract included consent to a suit on a contract by a subrogee. That was the way the court phrased it, and the court held that it did. So Lumbermans is clearly a subrogee. The distinction is between the jurisdictional basis, Lumbermans being a subrogee and an under-insurance company of the West, therefore, has a right under the Tucker Act to bring any claim. That's what the Tucker Act said. It's a waiver of claims, a waiver of sovereign immunity to bring any claims. Now, once it's given that access to the court as a subrogee, the question is, can it bring, does it have the evidence upon which to rest a claim as described in national surety? The jurisdictional basis for both is the same. For national surety in this case, it's the exact same. It's the status of the surety as a subrogee, the different kinds of claims. I thought you'd agreed with me that it wasn't a subrogee. It couldn't really, the equitable subrogation doesn't work. It must be some related theory. Let me just back up a second. As I understand the impairment, what's being impaired is the right of equitable subrogation. Is that? No, sir. No, no. It's the security that's held by the government that's being impaired. In this case, the contract funds. That impairment. It's an impairment of collateral. Yes, sir. That's what your underlying claim is. And you say you can raise the impairment of collateral because you're a subrogee, even though you're not raising a claim of subrogation. Of equitable subrogation. As that phrase is, I think you're right. I agree with you, but the confusion I think comes up with, we talk about the classic claim of equitable subrogation before the court is a stakeholder suit. Where notice is provided by the surety that you shouldn't, that the government shouldn't make a payment. The payment is nonetheless made. The surety fulfills its obligations under the payment or performance bond and then comes to the government and says, you owe me that money because you shouldn't have and it can't make a decision on its own to pay it out when the notice is provided by the surety. This isn't a stakeholder case. I don't see that these equitable subrogation cases are necessarily stakeholder cases either because what you're saying is that once notice is provided to the government that the surety steps into the shoes of the contractor and the government is then obligated to pay the surety rather than the contractor. I misspoke, Your Honor. In order to have a valid stakeholder claim in terms of proving the elements of the case, the surety must have provided that notice. But in order to gain access to the court to make that claim, to have the subject matter jurisdiction to get to the court, the surety has to fulfill its obligations under the payment or performance bond and become a subrogee. It steps into the shoes of the contractor and benefits from the contractor's privity with the government, right? It gives the surety a right to sue on the contract under the principles of subrogation. Yes, sir. And that's the surety's access to the court. Right, but that problem is that that theory of stepping into the shoes of the contractor doesn't benefit you here. It doesn't work here. But, Your Honor, I believe it does because we're not... The surety, when it steps into the shoes under the rights of subrogation, is not limited to the rights that the contractor would assert, the claims that the contractor would assert or could assert. Most of these cases under the subrogation, when a surety asserts a claim of equitable subrogation, are claims that the contractor would not or could not assert to begin with. Wrongful payment to the contractor. Sureties make those claims. That's what Insurance Company of the West was. Yeah, but that's a situation where the notice allows them to step into the shoes of the contractor. There wasn't any notice here. There wasn't any stepping into the shoes of the contractor. That seems to be the problem. That the theory of recovery is not based on acquired privity or something like that. It's based on... It seems as though it's sort of a common law theory that surety should have the affirmative recovery. And the problem that it seems to me exists is that that really is a state law theory that may not be within the waiver of sovereign immunity under Blue Fox. Your Honor, it's the right as a subrogee by performing under the payment or performance bond that provides the waiver of sovereign immunity to bring any claim under the contract, under the Tucker Act. That's the court's holding in Insurance Company of the West. Pursuant to national surety, the elements of a pro tanto discharge claim do not include the provision of notice by the surety to the government. Notice is... I mean, the claim can exist irrespective of notice. And this is a surety claim brought as a result of being subrogated to the contractor, to the contractor's rights to be before the court under the Tucker Act. So the confusion I think is because there's a conflation of this, of the jurisdictional bases for being before the court and the elements of the claim that is being pursued at the same time. They're not the same. This court held in Insurance Company of the West, subrogation, the surety as a subrogee has a right to be in front of the court and under because it is now, as a subrogee, has privity of contract to pursue those suits, pursue those claims. And the Tucker Act says any claim. This court in national surety said that one of those claims, like a stakeholder suit, but another one of those claims is a claim under pro tanto discharge. And that particular claim... But it's not a claim based on the contract between the government and the prime contractor, Landmark, right? No, Your Honor. It need not be. It's a surety's claim. Yeah, it's the surety's claim. It's not based on that contract between the government and Landmark. Well, Your Honor, the jurisdictional basis for being before the court is the privity on that contract, yes. Because as a subrogee... I don't understand. How is the subrogee suing under that contract as opposed to suing because it has rights as a surety? Well, the rights of a surety relate back to the date it executed the bond once it becomes a subrogee. That's what this court has held. But our cases say the subrogee is not a party, the surety is not a party to the government Landmark contract. That is correct. So how is it that the surety here is asserting rights under that contract? It's asserting... What it obtains under that contract is privity as a result of its status as a subrogee. And what it's status in that situation is its claim that the government breached the underlying contract by making improper payments to the contractor and thereby impairing its status, the security, the collateral for the contract performance. It seems like you're saying that in a surety situation, even though the surety does not have privity through the original, the initial contract between the contractor and the government, it has a kind of quasi-privity that in its role as subrogee, it gets the same access to the court of federal claims through the waiver of sovereign immunity. Yes, Your Honor. That's what this court held in Insurance Company of the West. That was the exact holding of this court. As a subrogee, we hold that a subrogee... And can raise any claim. That's what the Tucker Act says, Your Honor. No matter what. As long as it... Once it's into court, then it's free to raise any claim. There's no limit. Sovereign immunity doesn't impose any limit on the claims it can raise. And it gets into court by virtue of its status as a subrogee to the original contract, even though it doesn't have privity to that original contract. Yes, Your Honor. It gains access through its status as a subrogee. And once it has access under the Tucker Act, the Tucker Act specifically permits any claim on that contract. Even though the subrogee contract is dismissed. I'm not sure I understand. It's dismissed in this case, right? Well, no, sir. Again, that's... The distinction we're drawing there is that the equitable subrogation claims, the type of claim, that's one type of claim that a surety could bring, that claim was dismissed because that type of claim requires, in order to prove the elements of that claim, prior notice. Don't make these payments, Governor. That prior notice was not provided. But that is the way you got into court, right? No, Your Honor. Both claims, both types of claims, we got into court... Surety got into court because it had fulfilled its performance bond. It became a subrogee. Once it got there, it made claims for both equitable subrogation under a stakeholder type claim and for a pro tanto discharge claim. The equitable subrogation claim, i.e. the takeover claim, was dismissed because no prior notice had been provided. And that is an element of that type of claim. You agree with that? Do you agree with that, Your Honor? No notice was provided, Your Honor. No, that is an appropriate ground for dismissal of an equitable subrogation claim under these facts. Under these facts, yes, Your Honor. Under the facts of, i.e. with regard to a progress payment, let's say, as opposed to, for example, retainage. Well, I'm not sure... I'm not sure whether you read, maybe you don't read national security as predicated on equitable subrogation at all, notwithstanding the language used in the opinion. The concept of equitable subrogation as giving the surety the rights as a subrogee, yes, that's the jurisdictional basis for it. So I agree with it in that context. But when the court says that... It says that notice wasn't provided. I mean, no notice was provided. Yet the court permitted the case to go forward. That is different from every other situation in which a court has identified one of these claims as an equitable subrogation claim as opposed to the status as a subrogee for jurisdictional basis. Which raises the question whether there's something that's distinctive about retainage that differentiates it from other types of things, such as progress payment, overpayment of progress payments. No, Your Honor, I don't think there is. I mean, it seems to kind of belie common sense for 10% of the contract value, which is essentially what retainage is, for the government to not be allowed to do something with that 10% because it would impair the surety status, excuse me. But the government is free to do what it will with the remaining 90% of the contract value because it's under the progress payment clause. Well, let me... That moves us to the next question, which is what do you make of the requirements in the FAR with respect to progress payments? And let me offer you the following proposition and have you respond to it. That while there's mandatory language, the fact that there's mandatory language doesn't necessarily create a right to someone who feels aggrieved by the overpayment. That mandatory language may have been directed, for example, at the contractor saying you will not be paid until and unless you do the following, including prepare an appropriate certification, or even directed to the contracting officer in order to say, contracting officer, don't get sloppy and don't pay these things without certification. That doesn't necessarily mean that a third party, i.e. a surety, can come in and say, aha, there's mandatory language. I have a cause of action predicated on that mandatory language. Why is this not a situation in which that language is directed internally and to the contractor? You understand the question? Yes, sir. Yes, your honor, I do. And this court in national surety addressed that. The court said that the government must administer the contract in a way so as not to materially increase the risk of the surety. With respect to retainage. That was the subject matter of national surety. Agreed, your honor. But that principle of law, administering the contract in such a way so as not to increase the risk of the surety, is what the court held in the context of retainage. But to say that the government is free, for example, to pay out 90% of the contract value, leaving apart the retainage, up front because then the contractor defaults and then require the surety to come in and fix that problem when the contract funds are gone and no work has been done, extreme situation. But that's essentially what your honor's interpretation would permit. Now, if the language of the contracts were changed instead of saying the certification must be prepared and the payment will not be made except under the following circumstances, but was changed to the contracting officer may pay after receipt of certification and the various other requirements, the contracting officer may require those requirements to be met, then I guess your argument, you would have no argument, right? I disagree. What would your argument be? My argument would be, your honor, the contracting officer is still required pursuant to the progress payments clause, 5232-5, to make sure that progress payments are commensurate with entitled, in effect, to front the contractor more money than the progress payments clause under the contract technically minimally requires. The contractor is running into a little problem, so the contract allows a certain amount of flexibility on the part of the contracting officer. Then you would have no contract-based argument, right? I think you're right, your honor, but I do think that the payments clause already provides them a certain amount of discretion in that regard in any event. I mean, it says on estimates of work performed, commensurate with work performed. I mean, it's not binary in nature, a zero or a one in these cases. I mean, what's supposed to happen but what didn't happen was the contractor and the contracting officer are supposed to walk the project, determine how much work has been done, agree on that amount, and have a progress payment that actually reflects reality. The problem in this case is that wasn't done. None of the payments reflected reality because the contracting officer and his support staff did not do their job, period. What's the standard, do you think, by which the performance of the contracting officer should be judged? That is to say, is this a negligence standard? Is this an abuse of discretion standard? You're saying that the contracting officer did not abide by the terms of the contract and that it prejudiced your client. What should a court, in looking at the conduct, say is the proper test for that performance? Your honor, I'm not sure I understand. Are you asking what there's a mens rea element to? Well, suppose that the contracting officer reasonably but incorrectly concluded that the work had been done. He was informed by his staff and the contractor that the work had been done but he didn't do a thorough, maybe as thorough an examination of the project as might have been. Would that be enough to trigger the right on the part of the surety? No, your honor. What's the test then? There's decisions of this court and I believe of the lower court that address that situation where the contracting officer, in good faith, has gone out to a tent or the government, in good faith, has gone out and made decisions, discretionary decisions. They didn't reject the work perhaps that they should have rejected. They didn't inspect it closely enough to determine whether it should be rejected. And in those cases, payments were not improper because there was some discretion afforded there. This is not that case, though, your honor. We're talking about where nothing was done. They spent millions of dollars to the contractor in this case for material, cabinets, windows, doors, things like that, that simply were never provided. And how do they know they were never provided? Because the government not one time said, show me an invoice, show me a bill of lading, show me what I just paid you for that I now own as the government. That's what really happened. The contractor sold the government stuff that it had never bought or purchased or owned to begin with. And the government just allowed it to happen. In this kind of situation, it seems to me that there, if we were to assume hypothetically that there is a cause of action here, it's very unclear as to what constitutes impairment of security and when the surety, at least under state law, would have a claim. Is this, are these impairment questions ever addressed in the bond? And why not? Why doesn't the bond define what constitutes impairment? Well, the bond doesn't. I don't know, I don't know why it doesn't, your honor, but I know that it doesn't. Is that a general practice in the surety ship business that the bond is silent as to what constitutes impairment of security? State by state and the law defines what that is outside the context of the bond. I mean, the restatement of surety ship defines what that is. The bond itself doesn't contain it. But the restatement doesn't define what constitutes impairment in terms of whether one provision of the contract or another is designed to benefit the surety, right? That's not the issue, though, your honor. The question, and that's something that's been raised by the government from the trial court on. It doesn't matter that a particular clause in the contract to whom it was intended to benefit. That's not the issue. What national surety, it's the effect of the contracting officer's administration that is the question. Does the effect... I mean, even if the contract provision is for the, entirely for the benefit of the government, the surety can benefit from that? Well, your honor, I don't, I'm not aware of any particular clause that is solely for the benefit of the government. The surety looks at these contracts, bonds the contract as written, and those, and it's, and evaluates its risks based on the contract as written. Does the government have an obligation to protect itself from fraud? Well, of course it does. That's what all these things, that's what the payment... Obligation to protect itself from fraud? Yes, sir. The government, it has an interest in protecting itself from fraud, but when you say an obligation, that suggests that somebody else has a cause of action when the government fails to protect itself from fraud. Right here, your honor. That's, that's a very strange proposition. Well, I mean, I'll rephrase my statement. That comes very close to saying that, well, go ahead. I'll rephrase my statement, your honor. The point, as a matter of fact, is the government certainly has an interest to protect itself from fraud, and to make sure it gets what it pays for. And the surety, it relies on the government wanting to get what the government pays for. That's when it bonds the contract. Those are the terms of the contract. The progress payment clause says, you, I'm going to pay for what I receive. Not for what I don't receive, but what I receive. And the surety relies on that. Now, is that clause designed for the benefit of the surety? Well, it's hard to say, your honor. I'd say the argument exists, maybe yes, maybe no. But clearly, it does have an effect on the surety's risk when it evaluates that contract for the purposes of issuing a bond. And if the government is not going to enforce the terms of payment, which affect 90% of the contract, or the surety's security, the contract value, the funds held by the government, then the surety's risk is radically changed. And that's what happened in this case. Very well. Thank you, your honor. Thank you, Mr. Jackson. Mr. Kinner? We'll give you a couple of minutes of rebuttal. Yes, your honor. I'm afraid you may have pre-terminated one of my points, and that was, I wanted to clarify my point about the retainage earlier. And when I was asserting the importance of the retainage being specifically recognized by the court for the benefit of the surety, and that is the distinction I didn't clarify, that is one of the other distinctions with all the other terms. And all those other terms, progress payment, and the schedule, and all And the surety, and this is the problem that we assert, is the upside down view of the surety, in this case, in many cases, where the surety's position is effectively that the United States is contracted for security for the surety. The United States didn't contract for the benefit of the surety. The United States contracted, and all of the terms of the contract about the retainage, specifically, and occasionally other contracts, is for the United States, the benefit of the United States. The government is contracting to obtain goods and services, and all the terms of that contract are targeted at the ability of the United States to ensure that it receives those goods and services. The surety says, well, see, you blew it. The government screwed up because you didn't properly administer the contract to ensure that you were properly getting those goods and services. This case is a stark demonstration of how that happens when, indeed, by default, the government now is blamed for allegedly mismanaging the contract, when, in fact, the contracting officer testified that everything was working just fine. The contract was working perfectly well, and there was no basis for them to second guess what was going on, of our joint appendix. We cite the contracting officer's testimony where he's explaining that until there was some kind of notice, he has no reason to micromanage the production of the contract. That's one point. Secondly, it appears that the surety's argument is basically suggesting that it is, in fact, a third-party beneficiary to this contract. And we know that, of course, this court has dramatically, emphatically said that third-party beneficiary principles are never applied, and that is not how surety retains any risk. Well, but setting aside sovereign immunity for a moment, it is certainly the case that when you have a surety undertaking that the secondary obligor whitter, one of which, perhaps the most important of which, is not to impair collateral. And so we can't close our eyes to the fact that the surety has interests at stake in this contract. It's not as if they're wandering in as a volunteer who is providing nothing of value to the government. The government wants them there. Indeed, the government insists on their there. Otherwise, no contract. Indeed, and your honor, that's an interesting observation, because indeed the reason that the sureties are in the mix is specifically another tool for the benefit of the government. The purpose of the surety being there is for the benefit of the government. In other words, if the contractor defaults, the government is not left with an incomplete project. The government has certain things that it has to do for the surety. Indeed, your honor, and I do not mean to argue to this court that the surety should be without any commercial recourse. And certainly we don't, because we obviously take no exception whatsoever to its equitable segregation claim. Although dismissed, it had a viable one. But here you're saying that impairment is a defense, but it isn't an affirmative claim because of the waiver of sovereign immunity, right? Exactly, your honor. And specifically because, and this is the fundamental error in the surety's position, equitable segregation does not equal waiver of sovereign immunity. And that's the distinction. And that's why, while it may possess this as commercial interest, it cannot necessarily create it as a separate cause of action here. And this court has never adopted, ever, pro tanto discharge in that manner. The national surety does not stand for that, and it doesn't say it. And in fact, I would ask this court to end the casual citation of national surety for the pro tanto discharge principle, because that's the case they trot out every time whenever the government says, wait, what's your basis for bringing this suit? The surety says, well, pro tanto discharge was established in national surety, but it was not. And nor was it in Fireman's Fund. Indeed, in Fireman's Fund expressly it was not. So the distinction is that there is in federal commercial law, to the extent we're creating a separate commercial law, a limitation, an additional limitation that may not be present. It's not, certainly nowhere in the restatement of surety ship is sovereign immunity discussed, not surprisingly. And so that's the exception. All right. Thank you, Mr. Kenner. Thank you very much.